**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO.  05-30042 MLW |
| | ) | |
| CESAR CRUZ and | ) | |
| RICARDO DIAZ | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS,**
**OR IN THE ALTERNATIVE**
**TO SUPPRESS TESTIMONY OF JULIAN RIOS**

**I. FACTS**

The defendants were charged with one count of Conspiracy to Possess with Intent to Distribute and Distribution of Cocaine, and two counts of Possession with Intent to Distribute and Distribution of Cocaine.  The conspiracy count alleged that the duration of the conspiracy was from a time unknown to the Grand Jury, but at least by or about January 2005, and continuing thereafter..."

The government's case depended to a great extent upon the testimony of a Confidential Informant, Julian Rios, who had met with the defendants in what were alleged to be cocaine transactions in January and March of 2005.  Although equipped with an electronic recording device,  no clear video of any controlled substance was obtained by Rios.  Defense counsel argued that the government's evidence was unclear, and that Rios was not credible.

Prior to trial, the defendants had specifically requested discovery of the Initial

1

Suitability Review, mandatory under the Attorney General's Guidelines Regarding The Use of Confidential Informants, of government witness Julian Rios. The government had replied that Rios was not a CI, was therefore not subject to that requirement, and no such document existed. <u>See</u> Motion Exhibits 1A through 1D.

On the second day of trial of this matter, Case Agent Mark Karengekis testified that Juan Rios had in fact been a Confidential Informant, and that a document complying with the guideline requirements, which he referred to as an "opening memo"[1] was available and in the case file. The Court ordered disclosure of all such documents, as well as any forms 209 documenting money provided to Rios for the purpose of making "controlled buys." Over night, the government assembled, copied, and provided to the defendants a large number of documents, including the document apparently described by Agent Karengekis, stating that "the following individual <u>is to be opened under the initial suitability report and recommendation</u> (SR&R) as a CI or as a CW." <u>See</u> Motion Exhibit 2, p. 1 "Details," ¶ 1. The document also states that Rios "<u>was operated</u> as a CI while incarcerated, and is now released." <u>Id</u>., p. 6, ¶ 8 (emphasis added)." Other documents in the overnight disclosure state that "Captioned subject was opened on April 27, 2004." <u>See</u> Motion Exhibit 3.

Also among the reports provided overnight for the first time to defense counsel was a narrative detailing a "ruse" murder created by the FBI and Rios, in which he posed

---

[1] A transcript of this day of the trial is not yet available. Accordingly, terminology used by the agent is based on counsel's memory.

2

as a "Puerto Rican hit man" under the control of two Italian mafioso, Slim Mark and

Frankie O (Case Agent Mark Karengekis and Task Force Officer Frank Ott,). <u>See</u> Motion

Exhibit 4. Defense counsel had received previous information that two other targets of

the broader investigation, "Operation Dethrone," claimed they were in great fear of

violence at the hands of Rios or others under his control, and had been coerced into

selling drugs, even though they had left the drug-dealing life many years before.

Defendants had made strategic decisions to discount this information in allocating

pretrial resources, framing opening arguments, and cross-examination of witnesses. This

decision was made without benefit of the detailed information about the perpetration

of a "hit man ruse" by Rios and the FBI in this new discovery. [2]

Late disclosure during trial of this new information concerning this ruse, including

identification of a previously undisclosed witness, George Jones, presented the

defendants with a dilemma: on one hand, whether to continue with the original jury,

before whom they had elicited useful points on cross-examination of the Government's

witness; or on the other, whether to seek a mistrial so as to be able to fully investigate

a newly-attractive avenue of defense. The late-disclosed documents also included

---

[2] Defendant's had received pretrial discovery indicating that Rios had participated in "getting a gun off the street" by making it appear the gun had been used in a killing, but were unaware that he had let it be known generally that he was a "hit man," had claimed to have killed a man in Vermont, or that federal agents had participated by masquerading as mafioso, thereby enhancing his aura of dangerousness, and bolstering his claim that he could order others to enforce his demands through violence.

additional information of rewards or inducements, including the fact that Rios had been

allowed to choose his relocation destination, and chose "the [redacted], a territory of

the [redacted]", <u>See</u> Exhibit 5, p.3, ¶ 3; and  also that he was advanced $1700.00 to

cover expenses related to dental work.  <u>See</u> Exhibit 6, p. 2, ¶ 6.

The proceedings were thrown into further confusion by the Government's failure,

in the initial overnight disclosures between the second and third day of trial, to include

all of the forms 209, such that it initially appeared that buy money for the alleged March

30th transaction was unaccounted for in the FBI Records.  <u>See</u> Trial Tscpt, 9/27/06, pp.

10-13.  When yet another Form 209 was located during a break in the September 27th

proceedings, allegedly accounting for the March 30th money, a discrepancy still remained

between the differing amounts of money testified to by Agent Karengekis at trial, and

the amounts memorialized by the 209's.  <u>Id</u>. pp. 25-26.

## II.  QUESTIONS PRESENTED

A.    Where the government has failed to produce specifically requested
exculpatory evidence until the third day of a projected four-day trial,
together with new evidence  necessitating investigation of a previously-
abandoned line of defense, does Due Process and the protection of the
Double Jeopardy Clause require dismissal of the indictments?

B.    Where the government took diametrically opposed positions concerning the
scope of a two-person conspiracy, resulting in misjoinder of offenses and

requiring a mistrial, should retrial be barred by double jeopardy principals where other constitutional error made a remedy short of mistrial impractical?

c.   Does the Attorney General have the authority to prospectively authorize violation of state and federal statutes by persons who are not federal agents, and if so, is the scope of such authorization to be strictly construed?

## III.  SHORT ANSWER

A.   Where the government has failed to produce specifically requested exculpatory evidence until the third day of a projected four-day trial, and then also discloses other exculpatory evidence necessitating defense investigation of a previously-abandoned line of defense, Due Process the Double Jeopardy Clause require dismissal of the indictments.

B.   Where the government took diametrically opposed positions concerning the scope of a two-person conspiracy, resulting in misjoinder of offenses and requiring a mistrial, double jeopardy bars retrial where defendants were forced to request a mistrial in part because other constitutional error made a remedy short of mistrial impractical.

c.   The Attorney General does not have the authority to prospectively authorize violation of state and federal statutes by persons who are not federal agents; even if such authority could be inferred, the failure to

5

strictly comply with the Attorney General's regulations justifies suppression.

## IV.  Discussion

### A.  The Brady Violation

The disclosures made up to this time by the government in response to the defendants' repeated requests for the Initial Suitability Report and Recommendation required by § II.A.1 of the Attorney General's Guidelines Regarding The Use of Confidential Informants (hereinafter "the Guidelines") are indisputably exculpatory. The Karengekis "opening memo", as well as other documents provided during trial, make clear reference to Rios's status as a Confidential Informant (CI) five months before the memo itself was created, and seem to make reference to an earlier Initial Suitability Report and Recommendation which has never been produced. At a minimum these documents provide a basis for impeaching the government with regard to its adherence to its own procedures, particularly as to methods employed to insure the credibility of the informant who is the lynchpin of this case.

In addition, other documents produced late in the game, concerning the "ruse" murder created by the CI in concert with federal agents, is highly relevant to the defendant's theory, presented through Defendant Cruz's opening, that the video and audio recordings in the case are misleading. In addition, had that information been available prior to trial, defense counsel would have taken an altogether different tack with regard investigation of the claims by two other defendants in different "Operation

6

Dethrone" prosecutions regarding the use of coercion by Rios to create crimes that would not have otherwise occurred. See Defendants' Motion for Access to Witnesses, and Defendants' Motion for Funds for Investigator.

Brady material must be turned over prior to trial pursuant to Local Rule 116.1, even if it is otherwise protected by the Jencks Act. United States v. Owens, 933 F. Supp. 76, 84-85 (D. Mass. 1996) (Young, J.); accord United States v. Snell , 899 F. Supp. 17, 19 (D. Mass 1995) (Gertner, J.) Exculpatory evidence includes material that can be used to attack the credibility of prosecution witnesses. United States v. Bagely , 473 U.S. 667, 676 (1985). Courts have also recognized a class of "exculpatory evidence that would itself be inadmissible but is 'so promising a lead to strong exculpatory evidence that there could [have been] no justification for withholding it.'" Ferrara v. United States, Civ. No 00-11693-MLW, Memorandum and Order, Document 167-1, p. 87 (Wolf, J.) citing Ellsworth v. Warden, 333 F.3d 1, 5 (1st Cir 2003). The FBI memorandum concerning Rios' masquerade as a  hit man falls squarely into that category.

The defendants are unable, in the current posture of this case, to demonstrate that the failure to disclose the evidence in question was intentional on the part of the prosecutor personally.  Communication from the Assistant United States Attorney indicates that inquiry as to the specifically requested discovery was made to the FBI twice.  See Exhibits 1A through D.  However, the Supreme Court has placed the responsibility for failure to disclosure exculpatory material contained in law enforcement files squarely upon the prosecution. Kyles v. Whitley , 514 US 419 (1995).  For purposes

7

of Brady , the prosecutor and law enforcement are one and the same.  The Court has previously given short shrift to the claim that communication difficulties within the law enforcement establishment should excuse lapses in fulfillment of discovery obligations. "To the extent this places a burden on large prosecution offices, procedures and regulations can be established to carry that burden and to insure communications of all relevant information on each case to every lawyer who deals with it." Giglio v. United States, 490 U.S. 150, 154 (1972).  The local rules of the District of Massachusetts explicitly direct prosecutors to instruct law enforcement officials as to their discovery obligations. See Local Rule 116.8.

Pretrial discovery should take place *pretrial*.  Because the defendants did not have  the late-disclosed material, they made decisions about case preparation, how to allocate tasks between counsel, and whether to reserve opening, without full disclosure of the weaknesses in government's case.  The "inability of a defendant to adequately prepare his case skews the fairness of the entire system."  Barker v. Wingo, 407 US 514, 532 (1972).

In this case, the mid-trial disclosure took place not only in the context  of another, more "organic" problem with the present trial, but also as a sequel to a series of troubling prosecutions by federal law enforcement in the Eastern District of Massachusetts which have been terminated or overturned as a result of non-disclosure of exculpatory material.  This pattern of  cases has resulted in increasingly stern warnings from the bench, in an effort bring about compliance with the clear mandate

8

of the constitution, case law and the Local Rules. <u>United States v. Mannarino</u>, 850 F. Supp. 57, (D. Mass 1994) ; <u>United States v. Diamante</u>, 90 F. Supp. 2d 140 (2000); <u>Ferrara v. United State</u>s, <u>supra</u>. It would appear that even dismissal of an indictment without prejudice may have been insufficient in the past to correct longstanding patterns of non-compliance within the unique law enforcement culture of Eastern Massachusetts. "Perhaps I should have dismissed this case with prejudice to try to send a stronger message." <u>United States v. Diamante</u>, 90 F. Supp. 2d 140, 150 (2000) (Wolf, J.)

This case would be the appropriate occasion for reinforcing the message to law enforcement by dismissing the charges with prejudice, because not only are due process requirements of pretrial discovery implicated, but also the defendants' double jeopardy rights have been impaired. The decision to request a mistrial based on the misjoinder problem cannot be separated from the problems thrust upon the defendants by the late disclosure. Even should the previously abandoned line of investigation ultimately fail to bare fruit, the defendants simply had no way to predicting that in the midst of a short trial. Intelligently deciding whether to salvage the first trial by both waiving the misjoinder problems, and jettisoning the potentially dramatic evidence of Rios' coercion and deception of other Operation Dethrone targets, was impossible. As counsel noted at the time, the defendants reluctantly gave up their right to be tried by the jury initially empaneled. <u>United States v. Newton</u>, 327 F. 3d 17,26 (1st Cir. 2003). Dismissal with prejudice in consequence of the combined due process and double jeopardy violation would be an appropriate remedy, and a prudential prophylactic measure.

**B. The Misjoinder Problem**

The double Jeopardy clause of the Fifth Amendment protects a defendant in a criminal case against repeated prosecution for the same offense. United States v. Newton, 327 F. 3d 17, 21 (1st Cr. 2003). Where a defendant requests or acquiesces in declaration of a mistrial, double jeopardy protection may be waived. Ordinarily, the defendant may be retried unless the judge or prosecutor has deliberately provoked the defendant to request a mistrial. Oregon v. Kennedy, 456 U.S. 667, 678 (1982). Oregon v. Kennedy seems, by its terms, to foreclose double jeopardy protection based on a formerly available theory of mere "bad faith" or "harassment" by the government. United States v. Millan, 17 F. 3d 14, 18 (1994) citing Oregon v. Kennedy at 673. Even "gross negligence" on the part of the government has been said to be insufficient. United States v. Huang, 960 F. 2d 1128, 1133 (2d Cir. 1992).

The case at bar is distinguishable from Oregon v. Kennedy in that the nature of the government conduct causing the mistrial here is of an entirely different kind. In this case, the government resisted a motion for a bill of particulars as to the conspiracy count by defining, in the motion hearing, of the scope of the conspiracy, incorporating both the January and March drug transactions. [3] The government abruptly changed its

---

[3] Because Ricardo Diaz was charged with distributing crack cocaine in the March transaction, but the conspiracy count only charged cocaine hydrochloride, both defendants were presented with delicate strategic choices in the preparation of their joint defense, in light of the enhanced guideline penalties related to crack, and the constraints placed upon punishment for conduct not directly charged in an indictment by the Supreme Court. See United States v. Booker, 543 U.S. 220 (U.S. 2005).

theory mid-trial, and the untenable situation created by the provisional admission of hearsay regarding the March transaction emerged. The defendants were placed in a situation in which a mistrial became unavoidable. See United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). As to Cruz, there was essentially no way to "unring" a bell which had been struck repeatedly throughout the trial, even if the conspiracy count were severed mid-trial. As to Diaz, the only option short of mistrial would have been to go it alone after Cruz was mistried out of the case, becoming the sole focus of the trial after his attorney had sat out the opening arguments. Furthermore, both defendants would have had to make their decision while simultaneously dealing with the implications of the late-disclosed evidence discussed in Part B, supra.

The case does not fit the Oregon v. Kennedy mold because it is not obvious that the government sensed during trial that things were going badly, and thereafter chose to disrupt the proceedings and bring them to a halt.[4] Rather, the problem here lies at or close to the inception of the prosecution, when the government chose to draft an open-ended indictment, and then resisted the defendants' efforts to sharpen the issues. In effect, the prosecution sought impermissibly to preserve its option"to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." United States v. Adkinson, 135 F. 3d 1363, 1373 (11th Cir 1998) (citations

---

[4] There is no evidence in the record that the government's change of theory resulted from a sudden unavailability of evidence linking Cruz to the March transaction.

omitted).  This led inexorably to the mistrial, despite defense efforts determine the contours of the conspiracy.  The defendants were thereby deprived of their chosen jury, and their right to be tried in a single trial.  The government should not be rewarded for this stratagem, and  retrial should be barred.

**C. The Illegality of the Controlled Buys**

**1.    The Evidence Gathered By Rios Was Obtained In Violation Of Federal Law.**

The Government employed a confidential informant to obtain evidence which was indispensable to its case against the defendants.  In carrying out his assigned role in the government's investigation, Rios engaged in illegal activity: the purchase of controlled substances in violation of federal law [21 U.S.C. §844] and Massachusetts law [M.G.L. c. 94C §34], and the audio and video recording of some of his encounters with Cruz and Diaz, without their knowledge or consent, in violation of Massachusetts law.  M.G.L. c. 272 §99(C)(1).[5] At trial the government represented that all of this was authorized by federal law.   Examination of the record and the applicable law establishes that this investigative activity was not authorized by federal law but was conducted in violation of it.  At a minimum, the evidence which constitutes fruits of this illegality should  be excluded from any retrial.

**a.  No Statute Authorizes An Executive Officer Or Agency To License Private**

---

[5]  The statute exempts federal officials but not confidential informants from its purview. §99(D)(1)(c).

**Individuals To Violate Federal Or State Criminal Statutes.**

This case presents the question of whether the Attorney General has the power to exempt private individuals from the general obligation to obey federal and state criminal laws when they are employed as confidential informants in federal criminal investigations. The Department of Justice Guidelines Regarding the Use of Confidential Informants (DOJ Guidelines) assume that the Attorney General does have this power. Even if this assumption is correct, the guidelines limit the exercise of that assumed power to narrowly defined circumstances, and condition it on the satisfaction of stringent approval, supervision and enforcement standards which were not met in this case. The DOJ Guidelines were promulgated under the authority embodied in 28 U.S.C. §§509, 510 and 533.[6] None of these statutes can reasonably be read to authorize the commission of federal or state crimes by private individuals.

Sections 509 and 510 of Title 28 outline the powers of the Attorney General. Section 509 vests in the Attorney General, with four exceptions which do not apply to this case, "all functions" of other officers, employees and agencies of the Department of Justice. Section 510 empowers the Attorney General to delegate this authority to "any other officer, employee or agency of the Department of Justice." Together these statutes define the Attorney General's powers to investigate and prosecute crime, and the extent of his authority to delegate these powers within the Department of Justice.

---

[6]This authority is specified in the preamble to the May 30, 2002 Attorney General's (Ashcroft) Guidelines Regarding the Use of Confidential Informants.

See, In Re Sealed Case, 829 F, 2d 50, 55 & n. 29 (D.C. Cir. 1987).  By the terms of Section 510 the Attorney General may delegate these powers only to an officer, employee or agency of the Department of Justice.

The DOJ Guidelines, however,  assume that the Attorney General has the power to authorize confidential informants to engage in criminal activity on behalf of the United States in a criminal investigation.   This euphemism – "Otherwise Illegal Activity" ("OIA") – in the DOJ Guidelines refers to conduct which violates federal and state criminal statutes.  The Guidelines authors concede that no statutory authority exists for this practice when it is extended to persons who are not federal officers.

Any effort to justify the authorization of "otherwise illegal activity" requires attention to two separate problems: the violation of federal criminal statutes and the violation of state criminal statutes.  The DOJ Guidelines authors suggest that "federal prosecutors, as executive branch officers," possess inherent prosecutorial authority "to take reasonable measures to discharge the duties imposed on them as executive branch officers" to authorize civilians to violate both state and federal criminal statutes.  However, there is no implied prosecutorial power to license a civilian to commit crimes.

Actual authority may be conferred upon a federal officer either expressly or by necessary implication.  A government official possesses express authority only if the Constitution, a federal statute, or a duly promulgated regulation grants it in clear and unequivocal terms.  United States v. Flemmi, 225 F. 3d 78, 85 (1st Cir. 2000).  The authority to do an act may be implied "when that act is integral to the tasks assigned to

14

[the official] or otherwise necessary for the due accomplishment of those tasks." Id.

To obtain statutory immunity for an individual, a federal prosecutor must satisfy a bureaucratic process and then obtain a judicial order. 18 U.S.C. §6002. Although, as a practical matter, federal prosecutors possess the discretion to refrain from prosecuting any individual within their geographic jurisdiction who has violated a federal criminal statute, Flemmi, 225 F3d at 87, the power to elect not to prosecute is not the same as the power to authorize the commission of crimes prospectively. "The test is not whether such a power might from time to time prove advantageous, but, rather, whether such a power usually accompanies, is integral to, or is reasonably necessary for the due performance of the task." Id., at 86. Power to investigate does not imply the power to authorize criminal conduct in advance. The prosecution function can be effectively exercised without authorizing civilian criminal activity prospectively.

The claimed power to exempt private individuals from the duty to obey federal criminal laws encroaches on the legislative power to define what behavior will be prohibited as criminal and to declare that the prohibition applies to everyone, as exemplified by the introductory "Whoever ...." found in most such statutes. In this sense, it is a claim of greater power than the established executive power to grant immunity to individuals who may have violated such laws in the past. The power to grant federal immunity is shared among the three branches. Informal immunity, which can be conferred unilaterally by the executive in the exercise of its prosecutorial powers, is implicit in the inherent discretion exercised by prosecutors in deciding whom

to prosecute. Id.   But the grant of formal immunity is regulated by statute and the prosecutor's role is limited to that of applicant.   The actual grant of immunity must come from a judge.   If the executive lacks the power to unilaterally grant immunity from federal prosecution, it certainly lacks the power to exempt private individuals from the universal obligation to obey the criminal laws.

Similarly, the Supremacy Clause provides immunity from state court prosecution for government officials whose conduct violates state law. In Re Neagle, 134 U.S. 1, 58-76 (1890); State of New York v. Tanella, 374 F3d 141 (2nd Cir. 2004).  But this is not the categorical *carte blanche* suggested by the Guidelines authors.   Rather, Supremacy Clause immunity is a defense which must be established to the satisfaction of a federal judge, who must "walk[] the fine line created between the goal of protecting federal officials acting in the scope of their duties and the obligation to avoid granting a license to federal officials to flout state laws with impunity." Tanella, 374 F3d at 146. This immunity cannot be conferred in advance of the conduct in question by a federal executive official.

In summary, while informal immunity can be granted by an authorized prosecutor in favor of either a federal officer or a civilian for violations of federal criminal statutes, no federal executive authority exists for immunizing federal officers for violations of state criminal laws.   Nor does any federal statute authorize criminal activity by informants or other civilians in violation of either federal or state law.

**b.  Julian Rios Was Not Lawfully Authorized To Act As An FBI Confidential Informant Nor To Commit Crimes On Behalf Of The Federal Government.**

The DOJ Guidelines are not aspirational.  They are mandatory statements of the minimum standards to be met by Department of Justice Law Enforcement Agencies ["JLEA's"] and apply to the FBI.  See Guidelines at I(A)(1),(3),(4); I(B)(1)(b).  Rios  was a Confidential Informant as defined in I(B)(6) as early as April, 2004.   In order to be authorized to commit crimes, Rios had to be a fully operational CI, a status obtained only when the CI is registered at the conclusion of a successful suitability inquiry.  Guidelines, II(B); III(C).  Before utilizing Rios as a CI, SA Karengekis was required to complete a signed Initial Suitability Report and Recommendation, evaluating 17 defined factors ranging from the CI's age and alien status to his criminal history, his reliability and truthfulness, and whether he was then or had been a substance abuser.  Id., II(A)(1)(a-q). Each time Rios was re-authorized for a new period, the FBI was required to repeat the entire process.  Id. ,III(C)(8)(a).   In the event the FBI wanted to "expand in any material way" Rios' authorization, it was required to reiterate the entire process. Id., III(C)(8)(b).

In the event the FBI developed "reason to believe" that Rios had "failed to comply" with his written instructions, it was required to "immediately" revoke his authorization, inform him that he was no longer authorized, notify appropriate federal, state or local law enforcement officials, determine whether to deactivate him, and document each of these actions in his file.  III(C)(7)(a).

The record evidence shows that the DOJ Guidelines as they pertain to initiation of Rios' cooperation with the FBI were disregarded to a disturbing degree. In particular, as is set forth in paragraphs 6 and 7 of the Motion, the agent appears to have claimed at trial that his "opening memo" is a sufficient substitute for the Initial Suitability Report and Recommendation required by the guidelines. This is particularly odd in light of the fact that the FBI has at other times taken the position in this case that no Initial Suitability Report and Recommendation was required, and yet seems to imply in the "opening memo" that one already existed. This fast and loose interpretation of the guidelines runs exactly counter to the kind of the accountability the guidelines seek to impose.

Furthermore, the record also establishes that Rios was never properly authorized to initiate criminal activity with regard to the March 30th buy from Diaz. The "opening memo" stated that he would be used to investigate a "target group" of which he was a lifelong member, clearly a reference to the Latin Kings. See Motion Exhibit 2, ¶ 12. The subsequent requests for authorization to engage in criminal activity limited him to investigation of members of the Almighty Latin King/Queen Nation. See Motion Exhibit 7A through 7C.[7] Diaz was not named in any of the documents requesting authorization of Rios criminal activities. The government has never claimed he was a member of that

---

[7] The March 30th authorization request does not mention the Latin Kings directly, but does implicitly incorporate the previous requests and submissions by reference.

gang.

**2. Exclusion of Evidence Is The Appropriate Remedy For The Illegal Methods Used To Obtain The Evidence Against the Defendants.**

**a.  The Law Pertaining To Exclusion Of Evidence For Non-Constitutional Violations  Of Federal Law.**

The Supreme Court has recognized that suppression is an appropriate remedy for statutory violations, where the statute implicates Fourth and Fifth Amendment rights. Sanchez-Llamas v. Oregon, ___ U.S. ___, 126 S.Ct. 2669, 2681 (2006).  See e.g. McNabb v. United States, 318 U.S. 332, 341 (1943); Anderson v. United States, 318 U.S. 350, 355 (1943); Mallory v. United States, 354 U.S. 449, 454-456 (1957);  In Miller v. United States, 357 U.S. 301 (1958).

These precedents support application of an exclusionary rule to the evidence obtained by the FBI through its use of Rios in this case.  The only federal authority for committing crimes in the course of a criminal investigation belongs to the Attorney General, and his authority can be delegated only to his subordinate officers.  The purported delegation to Rios, a private individual working for the FBI as a confidential informant, was a violation of the statute limiting the Attorney General's power of delegation.  Further, in this case the FBI exacerbated this illegal delegation by failing to comply strictly with the approval, supervision and reporting requirements of the Guidelines.

### b. Procedural Considerations

The deficiencies in the FBI's compliance with it own guidelines were disclosed to the defendants for first time during trial. A mistrial ensued almost immediately . This fact explains his failure to file a written motion to suppress or dismiss prior to now. See, United States v. Paulino, 61 F3d 986, 994 n. 5 (1st Cir. (1995)(Government's failure to comply with Rule 12(d) notice requirement excused failure to file motion to suppress). The facts  on which his exclusion argument rests are derived from the trial evidence and subsequent disclosures from the government.  In these circumstances, an evidentiary hearing on suppression or some other sanction may be appropriate.  United States v. Forbes, 181 F3d 1, 8 (1st Cir. 1999).

## V. CONCLUSION

For the reasons stated in Part A and B above, retrial of this matter should be barred.  For the reasons stated in Part C, testimony of Julian Rios, and the recordings he acquired through violation of state and federal law, should be suppressed.


DATED: November 30, 2006

|  |  |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| Ricardo Diaz, Defendant | Cesar Cruz, Defendant |
|  |  |
| By: /s/ Terry Scott Nagel | By: /s/ Joseph Franco |
| Terry Scott Nagel, Esq. | Joseph Franco |
| 95 State Street, Suite 918 | 51 Park Ave. |
| Springfield, MA 01103 | W. Springfield, MA 01089 |
| (413) 731-8811 | (413) 737-2675 |
| BBO#:  366430 | BBO#: 543038 |

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on  November 30, 2006.

/s/ Terry Scott Nagel